RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0161p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JULIE SCHULZ HALBOWER, Trustee of Halbower
Legacy Trust,

          *Plaintiff-Appellant*,

    *v.*

HISCOX SYNDICATE 33 OF LLOYD'S OF LONDON,

          *Defendant-Appellee*.

No. 25-1152

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cv-00964—Robert J. Jonker, District Judge.

Argued: December 11, 2025

Decided and Filed: May 29, 2026

Before: STRANCH, BUSH, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kevin K. Russell, RUSSELL & WOOFTER LLC, Washington, D.C., for Appellant. Alexander W. Ross, CLYDE & CO US LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** Kevin K. Russell, GOLDSTEIN, RUSSELL & WOOFTER LLC and RUSSELL & WOOFTER LLC, Washington, D.C., Ronald G. DeWaard, Brion B. Doyle, VARNUM LLP, Grand Rapids, Michigan, for Appellant. Alexander W. Ross, Clinton E. Cameron, CLYDE & CO US LLP, Chicago, Illinois, for Appellee.

    READLER, J., delivered the opinion of the court in which STRANCH, J., concurred, and BUSH, J., concurred in the result. BUSH, J. (pp. 13–15), delivered a separate concurring opinion.

---

**OPINION**

---

READLER, Circuit Judge.   Julie Schulz Halbower, in her capacity as trustee of her family trust, sued her insurer for breach of contract based on a denial of insurance coverage.  The district court dismissed the action due to the complaint's lack of merit.  On appeal, we take a different course.  Because the parties did not adequately plead facts necessary to establish diversity jurisdiction, we remand the case to the district court to conduct further jurisdictional discovery.

I.

Understanding today's case requires an understanding of the complexities of Lloyd's of London, a "venerable" and familiar United Kingdom–based financial institution.  *Certain Interested Underwriters v. Layne*, 26 F.3d 39, 41 (6th Cir. 1994).  Yet that task may not be as easy as it seems.  Lloyd's business structure is unlike those we are familiar with on this side of the Atlantic. *See id.* (describing Lloyd's as "shrouded in the corporate vagaries of British law").

To unravel these corporate complexities, turn back the calendar to mid–17th century England, when coffee was introduced to the nation.  Entrepreneur Edward Lloyd opened a coffee house in London, near the River Thames.  *Coffee and Commerce*, Lloyd's, https://perma.cc/A58G-G9BN (last visited Mar. 26, 2026).  From its earliest days, the café's clientele frequented Lloyd's for more than just a warm drink.  Lloyd, it turns out, was also known for his vast knowledge of the shipping business:  He regularly published intelligence on ships, cargo, and foreign events.  *Edward Lloyd*, Lloyd's, https://perma.cc/C4WN-UPKR (last visited Mar. 30, 2026).  The coffee house quickly became a place where patrons, primarily those in the shipping industry, could engage in underwriting, that is, negotiating a fee to be paid in exchange for taking on financial risk held by another.  *Id.*  In the ensuing decades, Lloyd's customers came to be known as the "Society of Underwriters at Lloyd's Coffee House."  The Society would later evolve into what we now know as Lloyd's of London, an enterprise that today insures risks totaling "+£46bn in insurance premiums each year."  Lloyd's, *Pocket Guide*

5, https://perma.cc/W6BJ-7U53 (last visited Mar. 26, 2026). Lloyd's is closely regulated by British law, including the Lloyd's Acts of 1871 and 1982 and by Part XIX of the Financial Services and Markets Act of 2000.

While traditionally identified with the insurance industry, Lloyd's is not an insurance company. Rather, it is a marketplace where brokers place risks with underwriters. Julian Burling, *Lloyd's: Law and Practice* 1 (2014). Who those underwriters are bears some explanation. Typically, a Syndicate (or Syndicates), a term-of-art in the Lloyd's vernacular, is listed on the insurance contract as the underwriter. A Syndicate, however, has no legal identity and is not a partnership under British law; instead, "it is merely the administrative arrangement through which its members underwrite insurance risk." *Id.* at 3; *see also* 17 Jordan R. Plitt et al., *Couch on Insurance* § 241:10 (3d ed. 2025) (explaining the Lloyd's Syndicate structure). Those members, individually known as "Names," can be natural persons or a corporate body. Burling, *supra*, at 1. While it is possible for Syndicates to have only one underwriting Name, they routinely have multiple underwriting Names, sometimes over a thousand. *Id.* at 3. Pursuant to the Lloyd's Act of 1982, the Names that make up the Syndicate carry only several liability. *Id.* As a result, each Name is liable for its own share and not for those of others in the Syndicate. *Id.* at 1.

Another relevant player in the Lloyd's configuration is the Syndicate's Managing Agent. *See id.* at 151–52. Lloyd's Bylaws require every Syndicate to appoint a Managing Agent. *Id.* at 2. The Syndicate, in turn, delegates all responsibility for management for the underwriting business to that Agent. *See* HMRC Lloyd's Manual, *Introduction to Lloyd's: Basic Concepts and Terms: Managing Agents and Premium Trust Funds*, https://perma.cc/622M-H565 (last visited Mar. 26, 2026). Those duties include negotiating underwriting contracts on the Syndicate's behalf. Burling, *supra*, at 2 (explaining that the Syndicate "is required to delegate . . . absolute discretion to the managing agent as to what risks are to be written on [its] behalf"). That said, the Managing Agent is not an underwriting member of the Syndicate and thus does not carry liability. *See id.*

With most of the actors assembled, turn now to the production, specifically, the process for acquiring an insurance policy from a Lloyd's Syndicate. Acquisition is facilitated through a

Lloyd's Broker. A Lloyd's Broker, another Lloyd's term of art, describes an individual listed in the Lloyd's Broker database. *Id.* at 4. An entity desiring to obtain insurance through the Lloyd's marketplace must secure the services of a Lloyd's Broker, who will shop the entity's insurance proposal to Syndicates in the Lloyd's pool of underwriters. *Id.* at 4–5. In this way, the Lloyd's Broker serves as the insured's representative in the Lloyd's marketplace. *See* Ronald E. Mallen et al., *Law Office Guide to Purchasing Legal Malpractice Insurance* § 19:7 (2025). If a Syndicate agrees to take on the proposed underwriting risk, an insurance contract will be formed between the insured (represented by the Broker) and the Syndicate (represented by its Managing Agent). To borrow an analogy raised by counsel, the Lloyd's marketplace has traits in common with the New York Stock Exchange: "You can't just show up and say, 'I want to buy a stock in the New York Stock Exchange' any more than you can just show up on the floor of the Lloyd's market and say, 'I want to buy insurance.'" Motion Hearing Tr., R. 158, PageID 2748. In both instances, you must "go through people who are regulated and governed by the rules of the market." *Id.* That is the Lloyd's Broker.

## II.

The Lloyd's underwriting enterprise sets the backdrop for the dispute at hand, which regrettably arises from a tragedy. In June 2022, a fire broke out in a house owned by Julie and Matthew Halbower located near Pentwater, a lakeside community in Oceana County, Michigan. The blaze consumed the house, reducing it and its contents to ash.

Included in the lost items were five pieces of fine art that belonged to the Halbower Legacy Trust (for which Julie is trustee). Insurance records pseudonymously named those pieces the *Cliff*, the *Path*, the *Castle*, the *Prairie*, and the *River*. From the district court record, we can deduce that the *Cliff* was likely *Falaise a Varengeville* by Claude Monet, the *Path* was likely *La Route de Vetheuil* by Claude Monet, the *Castle* was likely *Ruines de Passy-les-Tours, Effet de Soleil* by Francis Picabia, and the *Prairie* was *Prairie, Ciel Nuageux* by Claude Monet, depicted here:



Figure 1 *Prairie, Ciel Nuageux* by Claude Monet

The *River* was not listed on any insurance schedule, so its true name remains subject to speculation.

The Halbowers filed an insurance claim, seeking coverage for their lost collection on a policy they, with the assistance of agent Tonja VanRoy, had obtained from the Lloyd's marketplace. The procurement of that policy bears describing. On behalf of the Halbowers, VanRoy communicated with Howden Insurance Brokers Limited, a Lloyd's Broker, to effectuate the coverage. Eventually, VanRoy received a proposed insurance policy with a $100 million policy limit, underwritten by Hiscox Syndicate 33, the managing agent for which is Hiscox Syndicate Limited. (We refer to the Syndicate as "Hiscox" and the managing agent as "HSL.") HSL, a company formed and registered in England and Wales, is not an underwriting Name of Hiscox, nor is it the Syndicate itself. Hiscox, for its part, is the only underwriter listed on the policy.

VanRoy confirmed the policy, and coverage began in early 2022. Following the Pentwater fire, VanRoy notified Howden of the loss of the Halbowers' collection. Approximately two months later, Hiscox acknowledged coverage for the *Path*, the *Cliff*, and the

*Castle*.  But it denied coverage for the *Prairie* and the *River* on the grounds that the two pieces were not included in the schedule "held on file by the Lloyd's Broker."  Hiscox MTD, R. 108, PageID 988.  Hiscox subsequently paid the Halbowers $31,333,315 for the three paintings acknowledged to be covered under the policy ($15,000,000 for the *Cliff*; $16,000,000 for the *Path*; and $333,315 for the *Castle*).

Upon receiving the partial denial of coverage, Julie, in her capacity as trustee for Halbower Legacy Trust, sued Hiscox in Michigan state court for breach of contract and declaratory judgment.  Through her complaint, Julie sought to recover the value of the two paintings for which Hiscox had been denied coverage—the *Prairie* and the *River*.  Hiscox removed the case to federal court and later moved to dismiss.  The district court granted Hiscox's motion, concluding that the Halbowers' insurance policy extended only to works included in a list held by the Lloyd's Broker.  Julie now appeals.

III.

As in district court, the parties focus their arguments on the insurance coverage aspects of their dispute.  But before we can proceed to answering that question, we must first determine whether the district court properly exercised jurisdiction over this case.  *Sherrod v. Wal-Mart Stores, Inc.*, 103 F.4th 410, 412 (6th Cir. 2024).  Neither party, we note, has raised a jurisdictional challenge.  Instead, both parties assume that jurisdiction is satisfied based on 28 U.S.C. § 1332(a)(2), which affords a district court "original jurisdiction [over] all civil actions where the matter in controversy exceeds the sum or value of $75,000," and the action "is between . . . citizens of a State and citizens or subjects of a foreign state."  Yet "even in the absence of a challenge from any party," we "have an independent obligation" to assure ourselves of jurisdiction.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).  Accordingly, we ordered the parties to file supplemental briefs addressing whether diversity jurisdiction exists in this case.  With the benefit of both briefing and argument on the matter, we turn to answering that threshold question.

A.  We understand § 1332(a)(2) to require complete diversity among the parties.  *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806).  If any defendant shares the same

citizenship as any plaintiff, diversity is destroyed. *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005). For a case like this one that begins in state court, we make our citizenship assessment at the time of removal. *Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 871 (6th Cir. 2000) (citing *Ahearn v. Charter Township of Bloomfield*, 100 F.3d 451, 453 (6th Cir. 1996)).

Sometimes, a party's citizenship is uncomplicated. That appears to be the case for plaintiff Halbower Legacy Trust. For diversity purposes, a trust's citizenship is based on its trustee's citizenship. *See Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 462 (1980); *Homfeld II, L.L.C. v. Comair Holdings, Inc.*, 53 F. App'x 731, 732 (6th Cir. 2002). Julie is the trustee of the Halbower Legacy Trust. And at the time of removal, she was a citizen of New Hampshire. Thus, for diversity purposes, plaintiff is a citizen of New Hampshire.

As to the party on the other side of the proverbial "v," however, the citizenship assessment is less clear cut. Defendant Hiscox, a foreign entity, does not easily align with our traditional conceptions of corporate structures. Hiscox is neither a corporation nor a partnership, nor does it have a "legal personality" under British Law. Appellee Supp. Br. 1–2. Rather, it is a group of Names, each of whom carries several liability, that "operates pursuant to a profit and loss sharing agreement . . . much like an investment fund." *Id.* In this respect, Hiscox functions in ways similar to an unincorporated association. *See* Rule 7.1 Corp. Disclosure, R. 2, PageID 47 (describing Hiscox as an unincorporated association).

To assess our ability to exercise jurisdiction over unincorporated associations, we look first and foremost to the dictates of Congress. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 197 (1990). Unincorporated associations often vary in structure and purpose, from a small group of people with a shared purpose to a large, formal partnership. *See Layne*, 26 F.3d at 41. Ordinarily, the question of which of the "assortment of artificial entities possessing different powers and characteristics" (like an unincorporated association) should be "entitled to be considered a 'citizen' for diversity purposes" would be Congress's to answer. *Carden*, 494 U.S. at 197. Yet while Congress has set out a diversity of citizenship requirement for purposes of federal diversity jurisdiction for corporations, *see* 28 U.S.C. § 1332(c)(1), it has not defined how courts ought to determine the citizenship of an artificial entity like a Lloyd's Syndicate.

The Supreme Court has filled the gap. Following its lead, we assess an unincorporated association's citizenship based on the citizenship of each of its members. *Carden*, 494 U.S. at 195–96; *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009). With *Carden* as our guide, we conclude, as have many other circuit courts facing similar circumstances, that Hiscox's citizenship is tied to the citizenship of each of its underwriting Names. *See Ind. Gas Co. v. Home Ins. Co.*, 141 F.3d 314, 319 (7th Cir. 1998) (Easterbrook, J.) (concluding that underwriting Lloyd's Syndicates must be treated like partnerships (unincorporated associations) for purposes of determining jurisdiction, meaning that each Name (as would each partner in a partnership) must be considered when determining citizenship for diversity purposes); *see also Underwriters v. Osting-Schwinn*, 613 F.3d 1079, 1091–92 (11th Cir. 2010) (same); *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 930–31 (2d Cir. 1998) (same). Assessing diversity jurisdiction thus requires us to review the citizenship of each of the underwriting Names of the Syndicate, Hiscox, listed on the policy at issue.

Given the fact-bound jurisdictional analysis in this case, we believe the district court is best positioned to determine the citizenship of each underwriting Name of Hiscox Syndicate 33. Accordingly, we remand this case to the district court with instructions to make the necessary citizenship determinations. *Cf. Hertz Corp. v. Friend*, 559 U.S. 77, 97 (2010) ("Because respondents should have a fair opportunity to litigate their case in light of our holding, . . . [we] remand the case for further proceedings consistent with this opinion."); *V & M Star, LP v. Centimark Corp.*, 596 F.3d 354, 357 (6th Cir. 2010) (remanding for a determination of the citizenship of a French corporate entity).

B.1. Hiscox sees our conclusion as at odds with *Certain Interested Underwriters v. Layne*, 26 F.3d 39 (6th Cir. 1994). To Hiscox's mind, *Layne* instructs that only the citizenship of the Managing Agent of the Syndicate (here, HSL) matters for purposes of diversity jurisdiction.

We disagree with Hiscox's reading of *Layne*. To understand why, revisit the circumstances there. Certain Interested Underwriters at Lloyd's sought a declaratory judgment in federal district court to deny coverage under an insurance policy. *Layne*, 26 F.3d at 40–41. Layne moved to dismiss for lack of jurisdiction. *Id.* at 41. All agreed that, for purposes of assessing the court's jurisdiction, Layne was a citizen of Tennessee. But the parties disagreed

over how to assess the citizenship of the plaintiff-Underwriters.   The plaintiff-Underwriters pleaded that they were citizens of Great Britain, and the district court concluded, over Layne's objection, that the parties were completely diverse.  *Id.*  Accordingly, the district court denied the motion, and the case eventually proceeded to trial, where the jury returned a verdict in favor of the plaintiff-Underwriters.  *Id.*  On appeal, Layne renewed his argument that the diversity jurisdiction analysis required assessing the citizenship of not just the particular plaintiff-Underwriters before the court, but instead all members of the Syndicate to which the plaintiffs belonged.  *Id.*

We disagreed and affirmed the district court's jurisdictional analysis:   Only the citizenship of the plaintiff-Underwriters before the court mattered for purposes of diversity.  We reached this conclusion based on a unique feature in the insurance policy at issue.  Unlike most Lloyd's policies, the policy at issue in *Layne* was not underwritten by a Syndicate.  *See* Burling, *supra*, at 2 (recognizing common practice of Lloyd's policies to be underwritten by a Syndicate). In fact, there was no Syndicate listed anywhere on the policy.  *Layne*, 26 F.3d at 43.  Instead, the policy was underwritten by "Certain Interested Underwriters at Lloyd's of London."  *Id.*  Faced with this seemingly one-of-a-kind scenario, we asked the "Certain Interested Underwriters" who appeared before the court to clarify their role in the policy structure.  *Id.* at 42.  They responded that they were the "active-underwriters," *id.*, a specific role under the Lloyd's Bylaws.  *See* Burling, *supra*, at 3 ("The active underwriter is the individual . . . with principal authority to accept risks on behalf of the members of the syndicate." (citation modified)).  And these active-underwriters attested that they were liable on the contract.  *Layne*, 26 F.3d at 43.

Accordingly, we concluded that the plaintiff-Underwriters were the only relevant parties for diversity purposes.  After all, they were the Underwriters who were "liable on the contract," "wrote the insurance, processed the claim, and [were] authorized to sue on the policy."  *Id.* Viewing any remaining, undisclosed underwriters of the Syndicate as akin to an undisclosed principal, we deemed those nonparties as irrelevant to the diversity analysis.  *Id.* at 43 ("An agent purporting to act upon his own account, but in fact making a contract on account of an undisclosed principal, is a party to the contract." (quoting Restatement (Second) of Agency § 322 (A.L.I. 1958))).

Contrary to Hiscox's suggestion here, we do not read *Layne* to extend federal jurisdiction based solely on the citizenship of a Managing Agent, which has a limited role in the Lloyd's structure and is neither listed nor liable on the insurance policy here.  Rather, *Layne* recognized that a distinct position under the Lloyd's Bylaws, the active underwriters, could be relevant in the diversity assessment when the active underwriters were the only listed entity on the contract. 26 F.3d at 43.  With that understanding in mind, *Layne* does not bless assessing diversity based solely on the citizenship of the Managing Agent, an entity with no contractual obligations to the Halbowers.  Indeed, HSL would not be responsible for satisfying a judgment in favor of Julie. Rather, in accordance with Lloyd's regulations, a judgment against the Managing Agent would obligate only the listed underwriting Names of Hiscox, each of which would be required to pay their respective, proportionate shares.  True, *Layne* held that the plaintiff-Underwriters before the court acted as an "agent" under Tennessee agency law for other undisclosed Syndicate members. *Layne*, 26 F.3d at 43.  But that holding does not address whether a Syndicate's Managing Agent should be the benchmark for diversity of citizenship when a known Syndicate is sued for a denial of coverage.  As we have explained, it is not.

2.  While *Layne* is distinguishable on this point, we note that courts across the circuits have understood *Layne* as not requiring a jurisdictional analysis of the citizenship of each underwriting member of a Lloyd's Syndicate in coverage-related litigation.  And that reading of *Layne* has been criticized as contrary to *Carden*'s brightline rule that the citizenship of an unincorporated association depends on the citizenship of each of its members.  *See, e.g.*, *Ind. Gas*, 141 F.3d at 319 (criticizing *Layne* as wrongly decided); *E.R. Squibb & Sons*, 160 F.3d at 930–31 (distinguishing *Layne* and concluding "that federal courts must look to the individuals being represented rather than their collective representative to determine whether diversity of citizenship exists" (quoting *N. Tr. Co. v. Bunge Corp.*, 899 F.2d 591, 594 (7th Cir. 1990))); *Osting-Schwinn*, 613 F.3d at 1090–91 (disagreeing with *Layne* and concluding that "a Lloyd's syndicate must plead the citizenship of each Name to establish diversity jurisdiction").  For these reasons, it bears addressing *Layne* further.

We read *Layne* to hold that, for purposes of diversity jurisdiction, where the Syndicate is not listed on the insurance policy in question, only the citizenship of the plaintiff-Underwriters

(as opposed to all underwriters in the Syndicate) is relevant. At issue in *Layne* was how to "determin[e] whether there is complete diversity of citizenship" when not all members of a Syndicate are plaintiffs in the litigation, and those that are—the certain plaintiff-Underwriters— do not purport to belong to or represent any Syndicate. *Layne*, 26 F.3d at 42.

To answer that question, *Layne* employed Federal Rule of Civil Procedure 17(a)'s real party in interest test. *Id.* at 42–43; *see* Fed. R. Civ. Proc. 17(a) ("An action must be *prosecuted* in the name of the real party in interest." (emphasis added)); 6A *Wright & Miller's Federal Practice & Procedure* § 1542 (3d ed. 2025). Applying Tennessee law (the governing substantive law), *Layne* held that the plaintiff-Underwriters were the real parties in interest because they operated as agents for an undisclosed principal: "They actually wrote the insurance, processed the claim, and [were] authorized to sue on the policy" and were listed on the policy, whereas "the [S]yndicates insuring the risk [were] not listed anywhere on the policy." *Id.* at 43. As mentioned, that latter fact is unusual for a Lloyd's contract, which customarily lists the policy-holding Syndicate (or Syndicates) as the signatory (or signatories) of the policy. For reasons unknown, that was not the case in *Layne*. "Several [S]yndicates were involved in the risk at issue," yet none of them were listed on the policy. Appellee Br. at 10, *Certain Interested Underwriters v. Layne*, 26 F.3d 39 (6th Cir. 1994) (No. 92-6079); *see also id.* at 10–12 (explaining that the "certain interested underwriters at Lloyd's, London" were "the only 'insurer' named on the policy" and were the only "obligors on the contract").

*Layne* thus stands for the narrow proposition that when a Lloyd's policy is insured only by "Certain Interested Underwriters" (and not one or multiple Syndicates), those particular "Certain Interested Underwriters" are the real parties in interest. Once those parties are determined, a court must then separately assess the citizenship of those parties. As *Layne* itself explained, Rule 17(a) is not jurisdictional, meaning jurisdiction must be assessed separately from the real party in interest analysis. *See Layne*, 26 F.3d at 42 n.1.

The concurring opinion reads *Layne* differently. It understands the decision to dictate that we treat Syndicates as undisclosed principals for purposes of diversity regardless of whether the Syndicate is listed on the policy. Setting aside the oddity in characterizing Hiscox Syndicate 33, the party disclosed on the policy here, as an "undisclosed principal,"

*see* Concurring Op. at 15, we hesitate to read *Layne* in this way and are skeptical of the idea that an approach so dependent on a given state's agency law is the appropriate way to fashion a jurisdictional rule for this bespoke British institution and its Syndicates.

We take no position on whether *Layne*'s holding as to the unusual contract at issue there was correct, let alone attempt to dislodge that holding. *See United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017) (citing *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)) (recognizing that one panel of our court cannot overrule another). What matters for today's purposes is that *Layne* did not purport to answer the question of how to assess the citizenship of a Lloyd's Syndicate. That question requires an answer when, as here, a Syndicate or another unincorporated association is a party to a federal lawsuit. (Recall that Julie opted to sue the entire Syndicate, not an individual underwriter or agent.) And as *Carden* has explained, in that instance we look to the citizenship of all of the Syndicate's members. *Carden*, 494 U.S. at 195–96 (holding that, when a federal court is assessing the citizenship of an unincorporated association for purposes of diversity jurisdiction, it must consider the citizenship of all members of the association); *see also Layne*, 26 F.3d at 41 (citing *Carden* for the proposition that "an unincorporated association . . . has no separate legal identity so its citizenship, at least for the purposes of diversity jurisdiction, is the citizenship of each of its members").

\*        \*        \*        \*        \*

Diversity jurisdiction in this case depends upon the citizenship of each underwriting Name of Hiscox Syndicate 33. As the district court relied solely on the citizenship of the Syndicate's Managing Agent (HSL) for purposes of assessing diversity, and as the matter of determining the citizenship of each underwriting Name of Hiscox Syndicate 33 would be best addressed by the very capable district court, we vacate the district court's dismissal and remand the case for further proceedings consistent with this opinion.

———————————

**CONCURRENCE**

———————————

JOHN K. BUSH, Circuit Judge, concurring in the judgment.   The majority correctly holds that we need to vacate and remand to determine Hiscox's citizenship.   But I disagree with the majority's reasoning, so I concur only in the judgment.

\*                    \*                    \*

Lloyd's of London (Lloyd's) is an insurance marketplace in Britain.   46A C.J.S. *Insurance* § 2368 (May Update 2025).   A Lloyd's syndicate is an insurance company that sells policies on the Lloyd's marketplace.   *Id.*   Lloyd's syndicates are unincorporated associations that hire underwriting agents to write policies on their behalf.   *Id.*; *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160–61 (2d Cir. 1998); *Liberty Syndicates at Lloyd's v. Walnut Advisory Corp.*, No. CIV.A. 09-1343, 2011 WL 5825777, at \*1 n.1 (D.N.J. Nov. 16, 2011).

This case is a coverage dispute between a Lloyd's syndicate, Hiscox, and its insured, Julie Halbower.   Coverage disputes are not federal question cases, so the district court had jurisdiction only if the parties were completely diverse.   *See, e.g.*, *Cox v. Total Quality Logistics, Inc.*, 142 F.4th 847, 850 n.3 (6th Cir. 2025).

This court's decision in *Certain Interested Underwriters of Lloyd's, London, England v. Layne*, 26 F.3d 39 (6th Cir. 1994), lays out the framework for determining whether a Lloyd's entity and its insured are completely diverse.   In *Layne*, we explained that our focus is on the "real part[ies] to the controversy" because "the mere joinder or non-joinder of formal parties" will not impact whether the federal courts have jurisdiction.   *Id.* at 42 (first quoting *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 n.1 (1990); and then quoting *Wormley v. Wormley*, 21 U.S. (8 Wheat.) 421, 451 (1823)).   The court further explained that the syndicate and underwriting agent have a principal/agent relationship, with the syndicate being an undisclosed principal.   *Id.* at 43.   So we must ask whether, under the agency law of the State in which the district court sits (here, Michigan), the syndicate or the underwriting agent is liable on the policy.   *Id.*

In Michigan, both the undisclosed principal and the agent can be held liable on the contract, but if the plaintiff chooses to sue the former, the latter's liability is extinguished (and vice versa). *See Dodge v. Blood*, 300 N.W. 121, 125 (Mich. 1941); *Old Ben Coal Co. v. Universal Coal Co.*, 227 N.W. 794, 795 (Mich. 1929). Here, the plaintiff (Halbower) chose to sue the undisclosed principal (Hiscox) instead of the agent (HSL). That means Hiscox is liable on the contract, while the underwriting agent's liability has been extinguished. Therefore, Hiscox is the real party in interest. Because the district court's diversity determination was based on the underwriting agent instead of Hiscox, this court must vacate and remand.

The majority and I come to the same result, and our approach is not significantly different, but I still think the majority's approach is mistaken. The majority fails to apply *Layne*'s framework, skipping directly to determining whether Hiscox (the named defendant) is diverse from Halbower (the named plaintiff). *See* Majority at 6–8. But the Supreme Court has said that "the mere joinder or non-joinder of formal parties" will not impact whether the federal courts have jurisdiction, so the mere fact that Hiscox is the defendant does not decide the jurisdictional issue. *Wormley*, 21 U.S. (8 Wheat.) at 451.

This may not sound like it matters, but that is because we are dealing with an *un*disclosed principal. In those situations, the named parties are, by definition, the real parties in interest under Michigan law. *See Dodge*, 300 N.W. at 125; *Old Ben Coal Co.*, 227 N.W. at 795. But when the principal is a disclosed principal, the agent is not liable on the principal's contract absent a contrary statement in the agency contract. *See Howard & Howard Att'ys P.L.L.C. v. Jabbour*, 880 N.W.2d 1, 1–2 (Mich. Ct. App. 2015). Thus, in those cases, the real party in interest analysis might make a difference. Moreover, the agency analysis is a question of state law, which will necessarily vary from State to State, and skipping over that when another State's law applies might lead to outcome-determinative errors.[1]

---

[1]The majority questions whether state agency law is the appropriate mode of analysis, *see* Majority at 12, but it does not dispute that (1) state law governs the scope of a defendant's liability in a diversity case, (2) agency law dictates who is liable in a case involving a principal/agent relationship, and (3) the diversity analysis needs to focus on the real parties in interest—i.e., those entities who are entitled to bring the action and those who are liable to the plaintiff in the face of an adverse judgment, *see, e.g.*, *Lukowski v. CSX Transp., Inc.*, 416 F.3d 478, 484 (6th Cir. 2005); *In re M.T.G., Inc.*, 164 F.4th 564, 575 (6th Cir. 2026); *Wormley v. Wormley*, 21 U.S. (8 Wheat.) 421, 451

Additionally, I do not read *Layne* as applying to only those policies where the syndicate is not listed on the policy. *Contra* Majority at 12. Rather, in Michigan, an undisclosed principal is any entity whose identity is unknown to the contractual counterparty at the time of contracting, *see Detroit Pure Milk Co. v. Patterson*, 360 N.W.2d 221, 222–23 (Mich. Ct. App. 1984), and Hiscox's Names are unknown, so a Lloyd's syndicate can be an undisclosed principal even if its name is on the policy, *see* 4 *Couch on Insurance* § 55:2 n.5 (3d ed. Dec. 2025 Update).[2] Thus, the question is based on the nature of the principal/agency relationship under state law, not whether the insurance policy has the syndicate's name on it.

\*        \*        \*

For these reasons, I concur in the judgment.

---

(1823). If state agency law does not govern the diversity analysis in a case like this, then I am not sure what law would.

[2]The majority's unremarkable observation that the term "Hiscox Syndicate 33" is used in the policy does not change the analysis. For the principal to be disclosed here, it was not enough for the policy simply to mention Hiscox. Rather, the *Names* needed to be disclosed. After all, Hiscox has no legal personality separate from the Names, who are the real parties in interest. Those Names appear nowhere on the policy, and there is no way to tell who they are based simply on "Hiscox Syndicate 33." They therefore are undisclosed.